**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
………………………………………………..x
IVALEE BROWN,

       Plaintiff,

v.                                        **Case No.: 23-cv-7551**

MONTEFIORE HEALTH SYSTEMS INC.,           **COMPLAINT**
d.b.a MONTEFIORE MEDICAL CENTER,         (Demand for Jury)
MIRIAM PAPPO, CORVEL INC. and
MARY-ANN LATOUR,

       Defendants.
………………………………………………..x

     **PLAINTIFF IVALEE BROWN**, by and through her attorneys, The Law Offices of Tricia

S. Lindsay, PC, as and for her Complaint as of right against the Defendants, MONTEFIORE

HEALTH SYSTEMS INC., (d.b.a MONTEFIORE MEDICAL CENTER),  MIRIAM PAPPO,

CORVEL INC. and MARY-ANN LATOUR, respectfully sets forth:

<u>**PRELIMINARY STATEMENT**</u>

1.   This is a civil action seeking monetary relief, including past and ongoing economic loss,

injunctive relief, declaratory judgment, compensatory and punitive damages, disbursements, costs,

and fees for violations of Plaintiff's rights, brought pursuant to Title VII Civil Rights Act of 1964,

42 U.S.C § 1981, 42 U.S.C. 2000(e) et. seq.,  New York State Human Rights Law, Breach of the

Covenant of Good Faith and Fair Dealing, Civil Conspiracy**,** and Abuse of Process, on the basis

of her race and color.

2.  Specifically, Plaintiff alleges the collective Defendants negligently, wantonly,

intentionally, and knowingly, sought to and did wrongfully deprive her of rights, benefits, and

privileges as a result of her employment and contractual relationships with the Defendants through discrimination, harassment, invasion of privacy, misinformation, and misrepresentation.

**3.** Said acts were done with the consent and condonation of Defendants Montefiore Health Care Systems/Montefiore Medical Center, MIRIAM PAPPO, in her individual and official capacity, CORVEL INC. and MARY-ANN LATOUR, in her individual and official capacity, with the express purpose of denying Plaintiff rightful benefits pursuant to state law and having her terminated all on the basis of her race and color, and generally violating her rights as protected by the Constitution of the United States, the New York State Constitution and Federal, State and local statutes, rules, and regulations.

## PARTIES

**4.** Plaintiff IVALEE BROWN (hereinafter "PLAINTIFF" or "MS. BROWN"), is an African American Female from Jamaica West Indies, a citizen of the United States, and a resident of the County of Westchester, in the State of New York. Ms. Brown was employed with Montefiore Health Care Systems/Montefiore Medical Center (hereinafter "MMC")for more than twenty (20) years, from January 1999 up until the date of her wrongful termination on or about October 3, 2022.

**5.** At all times relevant to this action, Defendant MONTEFIORE HEALTH SYSTEMS INC., d.b.a as MONTEFIORE MEDICAL CENTER ("MMC") is a private, non-profit health system in located in the State and City of New York,  is comprised of 10 member hospitals and more than 200 outpatient ambulatory care sites.  MMC is also the University Hospital for the Albert Einstein College of Medicine. Montefiore Medical Center ("MMC") is located at 111 E. 210th Street, Bronx, New York 10467.

6.   At all times relevant in this action, Defendant MIRIAM PAPPO, sued here in her individual and official capacity, is a Caucasian-American Female employed by Defendant MMC as the Director of Clinical Nutrition for MMC and was Plaintiff's direct Supervisor. Upon information and belief, it is believed MS. PAPPO is retired from MMC at this time.

7.   At all times relevant to this action, Defendant CORVEL INC., is the Worker's Compensation insurance carrier for Defendant MMC, doing business in the State of New York.

8.   At all times relevant to this action, Defendant MARY- ANN LATOUR is a Caucasian-American Female employed as a Claims Specialist for Defendant CORVEL INC..  Defendant LATOUR was assigned to Plaintiff's claim and responsible for processing the Plaintiff's worker's compensation claim for benefits.

## **JURISDICTION**

9.   As Plaintiff claims Defendants discriminated against her based on her race and color in violation of Title VII of the Civil Rights Act of 1964, and New York State Human Rights Law. This action is brought pursuant to 42 U.S.C. § 1981 , this honorable Court has jurisdiction over the Plaintiff's claims pursuant to  28 U.S.C §§ 1331, 1343 and  the aforementioned statutory provisions.  This Court has Supplemental Jurisdiction pursuant to 28 U.S.C. § 1367.

10.  Plaintiff timely filed a Charge of Discrimination with the EEOC and initiates this action within ninety (90) days of the receipt of her Right to Sue letter received on May 27, 2023. **(See Exhibit 1)**.

11.  Venue is proper in the Southern District of New York as the Defendants all do business and are employed in this District, as well as all of the claims arise from actions which occurred in the Southern District.

## FACTUAL ALLEGATIONS

**Background**

**12.**   Plaintiff, Ms. Brown, is a Registered Dietitian ("RD") duly licensed in the State of New York.  Plaintiff has maintained her license pursuant to the requirements of New York State Education Department's ("NYSED") Division of Licensing, and she has worked for Montefiore Medical Center ("MMC") for more than twenty (20) years.

13.   As a background, Plaintiff was hired as a Diet Clerk in or about January 1999 and promoted to the position of Registered Dietician in or about September 2003.  At all times during her employment, Plaintiff performed her duties in an exemplary fashion, despite the fact that her work environment became increasingly hostile, manifesting in emotional, psychological, and physical abuse.

14.   Plaintiff is the only Black employee in the Clinical Nutrition Department.

**Defendant Miriam Pappo**

15.   Defendant MIRIAM PAPPO was hired in or about the same time period in 2003 as Clinical Director of the Department of Clinical Nutrition. Since being placed in her role as Clinical Director, MS. PAPPO has hired only one (1) other black person, Nicolette Keen, despite the numerous hires over the years.

16.   Upon information and belief, the only reason MS. PAPPO hired Ms. Keen was due to being pressured by staff to hire her and not because MS. PAPPO necessarily wanted to do so.

17.   Upon information and belief, Ms. Keen applied for the position of Clinical Dietician in the Clinical Nutrition department when an opening became available. On paper, MS. PAPPO was very impressed with Ms. Keen's qualifications and spoke about the anticipation of meeting and hiring her.  However, that all changed when Ms. Keen arrived for her interview with MS. PAPPO thus

4

revealing her race, color, and nationality, as an African- American Black woman from the county of Jamaica.

18.   To the surprise of the Clinical Nutrition staff, MS. PAPPO did not hire Ms. Keen, but she did hire a white male, named Steven Berghoef, with less qualifications for the same position.   MS. PAPPO attempted to justify her decision not to hire Ms. Keen stating that Ms. Keen did not have "inpatient experience" only "outpatient experience."   However, MS. PAPPO was fully aware of this prior to the day of Ms. Keen's interview.  This was a mere excuse to cover the real reason she refused to hire Ms. Keen, which was because Ms. Keen was Black.

19.   Thus, when other dieticians expressed outrage at the hiring of Mr. Berghoef, who they deemed less qualified than Ms. Keen, MS. PAPPO created a position for Ms. Keen that did not previously exist and hired Ms. Keen as a "Relief" for the other Dieticians, for the sole purpose of calming talk amongst the staff of racial bias in the hiring practices of MMC and MS. PAPPO.

20.   This is just one example of the discriminatory actions displayed and taken each day in the department of Clinical Nutrition by Defendant MIRIAM PAPPO.

21.   Throughout Plaintiff's tenure in the department of Clinical Nutrition of Defendant MMC, she was subjected to discrimination, harassment, and racist alienation at the hands of Defendant PAPPO.

**History Of Plaintiff's Work-Related Injuries**

22.   On one occasion in June of 1999, Plaintiff was seriously injured in a work-related incident while employed for Defendant MMC when a shelf fell on her head, causing injury to Plaintiff's neck and back which MMC was obviously aware of.  As a result of this injury, on July 26, 2004, Plaintiff was found to be permanently partially disabled.

23.  After this determination, a series of WC proceedings occurred.  In fact, between 2011 and 2020, Ms. Brown and MMC went back and forth before the WC Board on such issues as back injury, loss of work time, vision loss, and MMC's consistent objection to the Plaintiff's treatment.

24.  Finally, on April 1, 2022, after almost ten (10) years, the WC Board officially closed that case, issuing a decision that the Plaintiff "remains entitled to causally related medical treatment.

**Plaintiff's Request for Reasonable Prescribed Accommodation**

25.  In June of 2018, Plaintiff developed severe neck and shoulder pain while at work. She immediately reported to Dr. Daniel Shein, an orthopedics specialist, who prescribed an Ergonomic Workstation Kit ("EWS") for the Plaintiff.  This prescription was provided to Defendants MMC and MS. PAPPO.

26.  In concert with the EWS prescription, an Ergonomic Evaluation was done, but not until four (4) months later on or about October 29, 2018.  This evaluation was completed by Dominic Baretta, Manager of Environmental Health and Safety ("EHSM").  Mr. Baretta determined that an EWS was in fact needed and so he instructed that one be ordered to be installed for the Plaintiff to accommodate her medical needs.

27.  This EWS was and is a medical necessity that was required for the Plaintiff to continue working.

28.  A copy of this information was forwarded to MS. PAPPO, as was the information she needed to purchase the desk, including a reputable vendor quote, including delivery and installation.

29.  MS. PAPPO failed to take Plaintiff's situation seriously, and thereby delayed ordering the EWS while insisting on looking for a cheaper option, as she thought the quote was "too expensive."

MS. PAPPO had no proper authority to disregard the order or to determine what was an appropriate cost to order the prescribed medical equipment to meet Plaintiff's needs.

30.   Although she was in consistent pain, Plaintiff was reluctant to express her dissatisfaction out of fear of retaliation and maltreatment by Defendants, based on the culture and environment of treating the Black Dietitians differently than the White Dietitians, as created by Defendant MIRIAM PAPPO within the Department of Clinical Nutrition and supported by Defendant MMC.

31.   Plaintiff was therefore apprehensive about risking further maltreatment, targeting, and neglect from Defendants, in light of MS. PAPPO continuously expressing her displeasure with having to order the workstation for Plaintiff.   In fact, Plaintiff was told by MS. PAPPO directly, that her situation was "costing the hospital money."  In fact, Defendant PAPPO was so disgruntled about having to order Plaintiff's equipment that she decided and declared that she was going to order a different EWS from Amazon and install it herself.  This was outside the purview of her responsibilities and/or her authority to do so, and outside of the standard of medical equipment required.

32.   Needless to say, the EWS from Amazon was not sufficient to meet the Plaintiff's specific medical needs, was not medically approved and did not fit.

33.   Up to the date of Plaintiff's termination, the proper ergonomic workstation was never purchased in response to Plaintiff's request for reasonable accommodation as prescribed by Plaintiff's doctor, Defendant MMC'S Occupational Health Services, and EHS".  This callous, intentional disregard for Plaintiff's disability and physical and mental well-being caused a severe exacerbation of her injuries.

34.   Upon information and belief, in or about March of 2019, MS. PAPPO called the Plaintiff to inform her that she had ordered the EWS online and that they were awaiting delivery.

35.  However, once again, Defendant PAPPO intentionally lied to the Plaintiff as no desk ever arrived.

36.  Then, in or around May 2019, almost one year after Plaintiff's first (1st) prescription was written, still not having installed the EWS, MMC and MS. PAPPO was provided yet another prescription related to the Plaintiff's injury along with a letter of medical necessity from Dr. Shein, explaining the importance and necessity of the EWS.

37.  Unfortunately, Defendant PAPPO continued to disregard Plaintiff's request for reasonable accommodation, ignored the letter and unbelievably continued to refuse to order the EWS.

38.  As a result, over one year passed and the Plaintiff still did not have the EWS and was continuing to suffer in severe pain as a result. Multiple reminders were sent to Ms. Pappo regarding the EWS, including by her colleague and plaintiff's manager, Andrew Reda, in or about November of 2018.

39.  Consequently, in September of 2019, Plaintiff's worsening pain led to a severe flair up while at work causing her to visit Employee Health Services at MMC. While in the care of EHS, the medical doctor treating the Plaintiff contacted Jared Shapiro , Director of EHS to attempt to expedite the installation of the EWS. Subsequently, on or about September 13, 2019, Plaintiff provided a third (3rd) prescription.   Still, the necessary reasonable accommodation was not provided.

40.  Shockingly, after all of this, Defendant PAPPO, who was responsible for ensuring that Plaintiff received the prescribed medical equipment, still refused to purchase the EWS.

41.  Defendants were reminded on multiple occasions of their obligation to provide Plaintiff with the prescribed medical accommodation. Emails were sent in March, September, and October of 2019. In one email from October of 2019, Environmental Health and Safety Manager, Domenic

Baratta, sent a scathing email declaring "Your supervisor should've purchased the equipment immediately after the evaluation."

42. Upon information and belief, that same week, Defendant PAPPO decided to order the EWS, but she deliberately ordered a sample EWS from the supplier, purportedly as a "trial", which she claimed would only be used for two (2) weeks until a new one was purchased.

43. The "sample desk" was allegedly meant to be used to confirm the correct measurements of the permanent, medically approved desk and so, was meant to be temporary. However, this "temporary" desk did not fit, which frustrated Defendant PAPPO, and instead of being accountable for her error, Defendant PAPPO projected her frustration onto Plaintiff, rather than taking responsibility for her own poor judgment. Defendant PAPPO blamed Plaintiff for the situation and painted her as being overly needy and requiring "unnecessary accommodations."

44. Defendant MMC and PAPPO's malicious indifference to Plaintiff's medical needs is not only negligent, but it also reflects treatment that MMC would not and have not allowed to be administered to any of their White employees. Notably, the sample desk was not replaced after two (2) weeks which forced Plaintiff to continue using it despite the exacerbation of her injuries and the persistent excruciating pain it caused.

45. Defendant's apathetic approach to the medical needs of its African American employees is overt and well established in at least two (2) different cases, Plaintiff's, and Ms. Claire Esson-Samuels'. Ms. Esson-Samuels had very similar experiences while employed with Defendants MMC under the supervision of Defendant PAPPO. Both Plaintiff and Ms. Esson-Samuels are African American females from Jamaica, who share frighteningly similar allegations of racial discrimination committed by the same Defendants, most notably, MIRIAM PAPPO.

46.  Upon information and belief, after the incident with the temporary desk, Ms. Pappo began to retaliate against the Plaintiff via numerous channels of harassment, meticulously crafting a hostile work environment, therein isolating the Plaintiff from her peers, refusing to provide her with advancement opportunities, and not to mention, conspiring with Defendants MS. LATOUR and CORVEL INC. to deny the plaintiff's legitimate WC claims and to have her terminated.

47.  Then, as if MS. BROWN's work-related suffering was not enough, she also had to contend with MS. PAPPO making every attempt to have her terminated and was intent on weaponizing Ms. Brown's injury and potential leave of absence against her to achieve such an end, while simultaneously creating a work environment that was designed to isolate, harass, and scapegoat Ms. Brown. If MS. PAPPO could not bring about MS. BROWN'S termination, she was intent on making the environment so hostile, MS. BROWN would be forced to resign.

48.  One such way MS. PAPPO employed to accomplish this was to enhance and negatively influence the attitudes of Plaintiff's colleagues towards Plaintiff in order to isolate her from everyone else in the department.  MS. PAPPO would intentionally target Plaintiff and hold her responsible for the mistakes of other employees. This created a very tense situation in the department such that the hostility was evident.

49.  On one occasion, in or around February 2019, while Plaintiff was suffering in pain from the medical neglect by Defendants, Sarah Weindorf, a dietician employed by MMC, decided to continue a diet for a patient who was not eating.  This placed the patient at risk because Ms. Weindorf failed to consult with the patient on this decision, and thus disregarded the patient's specific nutritional needs. The nurse on duty at the time complained to the Plaintiff, MS. BROWN, about this decision and Plaintiff reported the situation to MS. PAPPO, who failed to do anything

to immediately correct the situation. Instead, MS. PAPPO instructed MS. BROWN to speak to Ms. Weindorf, despite the fact that this was MS. PAPPO'S responsibility.

50.  However, despite Plaintiff's attempt to alleviate the situation, although she had nothing to do with the mishap, Ms. Weindorf's poor decision was imputed to Plaintiff, rather than Ms. Weindorf, or the supervisors themselves. MS. PAPPO claimed she held Plaintiff responsible for Ms. Weindorf's mistake because Plaintiff was present and had knowledge of the situation.

51.  This was simply a pretext to mask the racial bias, as Ms. Weindorf is White, and Plaintiff is Black. Therefore, MS. PAPPO dared not reveal the mishap of Ms. Weindorf, but instead used the situation to try and portray Plaintiff, as incompetent, because she is a black woman.

52.  On another occasion, on or about December 17,2019, still in the midst of being denied her reasonable accommodation, Dietician Caitlin Cassidy changed a patient's tube feeding without consultation. MS. PAPPO disagreed with this decision and immediately defaulted once again to blame the Plaintiff.

53.  Neither Ms. Weindorf nor Ms. Cassidy were ever confronted about their errors. Instead, the fault was always deliberately laid on the Plaintiff, by MS. PAPPO.  The persistent disparate treatment and hostility shown towards Plaintiff only further exacerbated the racist, biased, and hostile environment created by MS. PAPPO and supported by Defendant MMC, as Defendants not only disregarded her medical needs, and retaliated against her by isolating her from her colleagues, and holding her accountable for the mistakes of the other dietitians, but they Plaintiff was also denied training, sabotaged, denied opportunities given to other Dietitians, and left out of projects which included other staff members.

54. In or around December of 2019, Plaintiff requested to be trained on Total Parenteral Nutrition Support (TPN) with employee Monica Salinas. Plaintiff's manager, Andrew Reda

properly scheduled her for the full day training which was necessary in order to be properly trained. However, on the morning of the training, Plaintiff was informed by Monica Salinas to report to her office at 12pm, instead of the morning as scheduled. As a result of this change, the training was drastically abbreviated down to two (2) hours during which time, MS. PAPPO constantly interrupted and micromanaged the session.

55.  Hence, between the abbreviated time and the multiple interruptions Plaintiff was not properly trained for TPN, yet she was still expected to have the same level of knowledge as her white counterparts who received full day TPN training.   When Plaintiff expressed her concerns about the changes to the training schedule to Mr. Reda resulting in insufficient TPN training, Mr. Reda said he was unaware of the change and subsequently rescheduled Plaintiff to be trained at a later date.

56.  MS. PAPPO'S interruption of Plaintiff's training was a deliberate attempt to sabotage the Plaintiff by preventing her from being able to competently perform her duties as required so as to implicate negative write-ups, deficient performance reviews and eventually disciplinary charges leading to termination or the denial of promotions sometime in the future.

57.  Plaintiff requested to be trained because TPN is typically an area in nutrition in which Dietitians receive certification as a Certified Nutrition Support Dietitian.  Plaintiff, Ms. Brown is not a Certified Nutrition Support Dietitian, nor was she properly trained or provided the proper support by MMC or MS. PAPPO, prior to being tasked with this duty.

58.  This tension between Plaintiff's duties and her ability to carry them out was deliberately created by MS. PAPPO to disparage Plaintiff in terms of the quality of her my work and her ability to perform her duties.

12

59.  Another example of the disparate treatment is the fact that Plaintiff was the only dietician denied the opportunity to be a preceptor for New York University interns in the oncology rotation. Every other dietician in the department was a preceptor except Plaintiff, whose rotation was taken away without explanation and only provided when she pressed the Defendants for a reason for their decision. At that point, in an attempt to cover for MS. PAPPO'S discrimination, Mr. Reda told Plaintiff the decision was made out of concern for her back/medical condition. However, this was never discussed with Plaintiff and their concern stopped short of providing the prescribed EWS she was still being denied.  This was a mere pretext for isolating Plaintiff, singling her out, and unjustifiably removing her duties, due to her race and color.

60.  At this point, it had been well over a year since the Plaintiff originally began experiencing the pain and received the prescription for the EWS. MS. PAPPO and MMC had yet to install the EWS and instead installed a workstation that knowingly did not meet the standard or measurements that the Plaintiff required. This delay in providing the prescribed EWS, and the installation of the incorrect EWS, exacerbated the PLAINTIFF'S symptoms significantly and the pain was severe as MS. BROWN was now experiencing extreme pain in her neck and back, as well as her elbows, wrists, shoulders, and fingers.

61.  MS. BROWN informed MS. PAPPO on several occasions about the discomfort she was experiencing and the exacerbation of her injuries, from the use of the "trial" workstation.  Plaintiff, MS. BROWN even asked MS. PAPPO to remove a portion of the overhead shelf so that she could raise the Versadesk.

62.  In early 2020, due to the continued callous disregard for her health, MS. BROWN began experiencing severe pain and swelling in all of her extremities. The used and refurbished ergonomic workstation provided to her was causing a worsening of her medical condition, and

Defendants MS. PAPPO and MMC continued to deny Plaintiff the necessary medical equipment despite multiple letters and prescriptions from her doctors and per EHS' orders and recommendations.

63.  Plaintiff was now at her wits end.  Not knowing what to do, she contacted EHS Manager, Mr. Baretta, who informed her that he would reevaluate the workstation, but she would need another prescription due to the length of time which had passed, though due to no fault of her own.

64.  On June 17, 2020, Plaintiff provided MMC and MS. PAPPO with a note from Dr. Afshan Khan, explaining that she required "light duty".  Once again, Defendants disregarded the prescription, scrutinized it as being "too vague,"  and MS. PAPPO demanded more details.

65.  Now in increasing pain due to Defendants' negligence and apathy, Plaintiff was also being harassed via email, by the Defendants, regarding her medical condition and the validity of her ailments. To avoid any more issues, and out of fear of still being denied the reasonable accommodation requested, Plaintiff received a more detailed note and provided it to Defendants.

66.  On June 20, 2020, Dr. Khan supplemented his note accordingly.  As such, due to the delayed and denied accommodation, the updated prescription stated, "*current workstation needs to be reevaluated, periodic rest every 15 minutes for 5 minutes, no heavy lifting and not repetitive hand movements*." Plaintiff was also told to avoid repetitive hand movements including typing and mouse grip in order to ensure appropriate rest for hand, forearm, neck, eye, and lower back.

67.  This note was sent to Mr. Reda and MS. PAPPO, neither of whom forwarded the note to EHS, as they knew they were required to do.

68.  On June 26, 2020, Plaintiff presented her revised doctor's note to the Employee Relations Manager, Ms. Georgia Colquhoun-Price.  Ms. Price in turn sent an email to the Plaintiff stating

that "**the medical note should be given to OHS (occupational health services) and they will contact your manager and our department,**" who would then contact her for an appointment.

69.  This email made it very clear that MS. PAPPO was not to receive the Plaintiff's medical documents. Upon information and belief, MS. PAPPO was informed directly by OHS.

70.  On or about June 30, 2020, Dr. Hacker from OHS conducted a telehealth appointment from which she concluded that Plaintiff should "alternate patient visits and reduce typing as much as possible."  Dr. Hacker further recommended Oral Transcription software to reduce typing, in addition to the already prescribed EWS that Defendants failed to install.

71.  Plaintiff's condition never would have declined to the point where it now became necessary for her to use oral transcription software had Defendants MMC and PAPPO simply followed the medical directives.

72.  Defendants MMC and PAPPO were fully aware of Plaintiff's degenerative condition and as a result of their negligence, the severity was hastened and Defendants seemed intent on assisting in that process, both physically and mentally.

73.  Throughout the month of July 2020, now more than two (2) years later, Plaintiff continued to meander endlessly in a cycle of false commitments and consistent disappointments from Defendants.

74.  On July 10, 2020, Plaintiff's neurologist Dr. Khan, prescribed an MRI of Plaintiff's right hand and arm.  He also requested a re-evaluation of Plaintiff's workstation. Defendants MMC and MS. PAPPO eventually performed a verbal assessment almost two (2) weeks later, on 07/22/2020. On or about the same day, as a result of the assessment, EHS Manager Mr. Baretta emailed Defendant PAPPO reiterating Plaintiff's ongoing need for the EWS, keypad, wrist pad, mouse, and mouse pad.  Mr. Paolo A. Impellizzeri, Safety Manager, subsequently placed an order for an

ergonomic keyboard, mouse, and padded wrist rests which he stated "…should have been part of the Versadesk from the beginning."

75. Unfortunately, before the additional equipment completely arrived, MS. BROWN'S condition deteriorated to a point where she was forced to go out on leave, due to the severity of her injuries which were continuing to worsen due to having to work without the appropriate workstation for more than two (2) years.

76. To date, the proper workstation has never been purchased and/or installed.

77. Thus, after more than two (2) years since Plaintiff was supposed to receive the prescribed medical equipment, she still had not, resulting in a severe pain and significant worsening of her condition all due to Defendant's malevolent attitude as they intentionally disregarded Plaintiff's medical needs waiting and hoping she would simply resign under the pressure, no longer able to withstand the heinous working conditions Defendants had intentionally created and supported.

**Workers' Compensation**

78. In early August of 2020, Plaintiff's worsening condition was reported to the Office of Occupational Health and Safety (OHS) who in turn instructed Plaintiff to call CorVel Corporation, who in turn filed a workers' compensation case on Plaintiff's behalf.

79. Plaintiff's workers' compensation claim was instantly mishandled by CORVEL, and Plaintiff received a notice the following day stating: *"the information received by the board indicates that you suffered an on the job- or work-related injury and have missed 0 days from work due to your on-the-job illness.* Please contact the Board if this information changes or is incorrect."

80. Upon information and belief, Defendant PAPPO then wrongfully interjected herself into the matter, deceptively misrepresenting herself as an employee of Health Care Risk Advisors (HRA) and thereby received Plaintiff's personal and confidential medical information through

fraudulent means. Defendant MMC as well as 1199 was and is completely aware of MS. PAPPO'S actions, but they chose to ignore it. As such, they have allowed MS. PAPPO'S illegal and discriminatory actions to continue unchecked and are thus complicit in her behavior.

81.   MS. PAPPO represented the address of her office as being the same address as the HRA. The New York Address of Health Care Risk Advisors is **111 West 33rd Street 8th FL, New York, NY 10120**. However, on Plaintiff's worker's FROI and C-8.1 forms, Defendant listed multiple addresses, one of which is **600 E 233rd street, 6th Floor Dietician Office, Bronx NY 10466**, phone number of **718-920-4253**, which is MS. PAPPO'S office number at location: Montefiore Medical Center **111 E 210 Street, Bronx, NY 10467.**  Defendant PAPPO intentionally and knowingly did this to divert Plaintiff's mail from being delivered to the proper location, to gain control over Plaintiff's workers' compensation matter.

82.   The multiple illicit actions done by Defendants, including but not limited to, fabricating medical documents, conspiring to steal personal and protected medical information, and overt attempts to manipulate the outcome of the workers' compensation case in favor of Defendants MMC and PAPPO, was done in hopes that Plaintiff would be terminated or resign. This was evident in Defendant's consistent disparate and harassing behavior towards Plaintiff.

83.   As a result, Defendant CORVEL CORPORATION ("CORVEL"), the workers' compensation carrier began reporting directly to MS. PAPPO, and sending all relevant medical and workers' compensation correspondence to Defendant PAPPO'S office as opposed to OHS, due to MS. PAPPO'S misrepresentation as an OHS representative.

84.   On August 4, 2020, Dr. Khan faxed a disability note to MS. PAPPO and EHS. Two days later, another MRI was performed on Plaintiff's right elbow, per the request of Dr. Khan.

85.   On or about August 17, 2020, Andrew Reda, under the instruction of MS. PAPPO, placed Plaintiff on ***non-work-related disability***. This was done without Plaintiff's knowledge or consent and resulted in loss of pay and loss of medical benefits as Defendant CORVEL denied the claim on such grounds, stating the case was controverted.

86.   The sheer amount of racial apathy and vitriol that Defendants harbor and displayed towards Plaintiff is pathological and their ability to exercise it freely and openly, void of any consequence, is antithetical to the virtues that encompass both legal and human rights.

87.   Defendant MMC as well as 1199 was and is completely aware of MS. PAPPO'S actions, but they have chosen to ignore it. As such, they have allowed her illegal and discriminatory actions to continue unchecked and are thus complicit in her behavior.

88.   It is undeniable that the plaintiff's leave of absence was the result of a **work-related injury**, caused by the negligence of MMC and MS. PAPPO in failing to install the EWS that numerous doctors demanded they install to accommodate the plaintiff's needs. MS. PAPPO'S designation of the Plaintiff's injuries as "**non-work-related**" violated MMC policy which dictates that **<u>once EHS is involved, the injury in question <u>automatically becomes a work-related injury</u></u>**. Furthermore, MS. PAPPO was entirely unqualified to make this determination, as she is not a doctor and did not examine or treat MS. BROWN.

89.   Ironically, on the same day MS. PAPPO designated MS. BROWN'S injuries and leave of absence as **"non-work-related"**, Defendant MS. LATOUR denied Plaintiff's WC claim.  As a result of this denial and MS. PAPPO'S lies, Plaintiff lost her 1199 Union benefits.

90.   MS. PAPPO used her administrative position and power to wrongfully obstruct and interfere with Plaintiff's worker's compensation case since its inception. MS. PAPPO was in constant   communication   with   MMC's   insurance   carrier   and   co-defendant,   CORVEL

CORPORATION via MS. LATOUR and as such wrongfully obtained confidential information in violation of MS. BROWN'S right to privacy under HIPAA, and the New York State and United States Constitution.

91.   Ms. Pappo also intentionally provided false information regarding Complainant's Workers' Compensation case which has nothing to do with her role as Director of Clinical Nutrition.  The "information" referred to here, was the false information provided by MS. PAPPO to CORVEL, and the false dictation of that information into the record by MS. LATOUR. This false information resulted in a denial of the plaintiff's claim.

92.   This was due to the conspiracy with MS. PAPPO and MS. LATOUR, and their inappropriate and illegal communications regarding Plaintiff's claim.

93.   On August 10, 2020, plaintiff retained the Law Offices of Joseph Romano to assist in her WC claim.  On August 20, 2020, the WC Board requested "further action by carrier/employer [Corvel]" regarding the WC claim.

94.   This carrier request was signed by MS. LATOUR, who deliberately misrepresented that the address for Employer Health Care Risk Providers, where all of the plaintiff's confidential medical information was sent, was **600 E 233rd ST, 6th floor Dietitian's office BRONX, NY 10466.**  The mail sent to this address was received and reviewed by MS. PAPPO and is not the address where the Plaintiff's medical documents should have been mailed. The correct address was and is **28 EAST 28TH STREET, 14TH FLOOR, NEW YORY, NY 10016**.

95.   MS. PAPPO also instructed CORVEL to send her the Plaintiff's medical documents directly, instead of to EHS office,  where they are supposed to be sent for confidentiality and HIPAA compliance. CORVEL representative and Defendant MARY-ANN LATOUR obliged

this request, knowing that it was an overt violation of HIPAA and the Plaintiff's privacy rights to do so.

96.   In another demonstration of their conspiracy to acquire the Plaintiff's medical records and deny her claim, MS. PAPPO and MS. LATOUR in fact provided at least four different false contact addresses to the WC Board; (1) **600 East 233rd street, 6th floor Dietitian's office, Bronx NY 10466,** (2) **600 E 233rd Street, CCU, Bronx, NY 1046*7***, (3) **600 E 233 Street, CCU, Bronx, NY *13220*,** and (4) **111 E 210 Street, Bronx, NY 10467.**  Notably, the incorrect zip code of *13220* applies to Syracuse, NY, where CORVEL Inc. is located.

97.   MS. LATOUR'S willful compliance with the malicious agenda of MS. PAPPO in violating Plaintiff's rights under HIPAA in order to try and get information that could be used to deny Plaintiff's benefits and ultimately terminate her employment was illegal and beyond the scope of her employment, and in violation of state and federal laws.

98.   All defendants therefore conspired to lie to WC Board in order to deny the Plaintiff's claims. The designation of non-medical leave was entered specifically so that CORVEL could deny the claim and falsifying the employer address allowed MS. PAPPO to illicitly spearhead and sabotage the claim, as well as illegally monitor all aspects of the Plaintiff's medical care and records, in violation of the Plaintiff's medical and civil rights.

99.   All of these addresses were various MMC units and floors provided to MS. LATOUR by MS. PAPPO, where MS. PAPPO could receive the Plaintiff's medical records without question or impediment.

100.   MS. LATOUR therefore repeatedly altered and falsified employer information in the WC record.

101.   On October 10, 2020, Plaintiff sent a letter to HR with the WC claim, informing them that this was an active case.

102.   On October 18, 2020, Plaintiff received a voice message from HR. In this voicemail, the HR representative stated that they did not know that the Plaintiff's injury was work-related, and that they were informed that this was a medical disability.   The denial from CORVEL and Defendant LATOUR was knowingly based on false information and testimony, and these defendants continued to deny the Plaintiff's claims for any medical treatment or benefits based on said false information.

103.   All notices of treatment (Form C-8.1), signed by MS. LATOUR, instructed the WC Board to forward notices regarding the Plaintiff's medical treatment to an address where MS. PAPPO could examine them.

104.   On October 19, 2020, MS. PAPPO mailed a harassing letter to the Plaintiff, demanding that she sign up for vacation and declare her weekend and holiday schedule for 2020/2021. This was on top of the persistent emails from MS. PAPPO, demanding medical notes from the Plaintiff. MS. PAPPO was well aware that the Plaintiff was not cleared to return to work, that this was a medical decision, not an administrative one, and that her demand for medical notes from the Plaintiff was completely out of line and inappropriate. These messages and demands continued into November, 2020.

105.   MS. PAPPO went so far as to demand that the Plaintiff copy her on all emails sent to HR to "keep her in the loop", and she further demanded Plaintiff provide her with the medical notes each time Plaintiff saw the doctor.

106.   Roughly two weeks after EHS contacted Ms. Pappo about the delay in purchasing the EWS, MS. PAPPO suddenly announced that she would be retiring from MMC.

107.  On April 1, 2021, MS. PAPPO falsely testified to the WC Board that Plaintiff **"took a medical leave of absence without pay."** MS. PAPPO also informed the WC Board that she had no idea why the Plaintiff took leave, and that the EWS took several months to obtain. None of this is accurate and MS. PAPPO was fully aware of the Plaintiff's medical situation.

108.  MS. PAPPO also informed the WC Board that the EWS took "several months" to arrive, despite the fact that five (5) years later, it still has not arrived.

109.  Around December of 2020, MS. PAPPO, in furtherance of her plan to have Plaintiff terminated and to deny her benefits, provided false information to the 1199 Union that Plaintiff took an unpaid leave in August of 2020 and was set to return in January of 2021. As a result of this misrepresentation from MS. PAPPO, the Plaintiff's union benefits were suspended.

**110.**  On January 5, 2021, Ms. Koreena Delgado from HR sent a letter to the Plaintiff explaining that **"[Y]our workers compensation benefits will be handled by the Occupational Health Services Office, so your claim can be processed with the respective Worker's Compensation carrier."**

**111.**  The WC Board set a hearing for this matter on April 1, 2021. In yet another act of malice and sabotage, Defendant LATOUR scheduled the Plaintiff's mandatory IME for the exact same date, two hours before the hearing. This was likely in the hopes that the Plaintiff would not be able to attend one or the other, as there was simply no excuse or justification for this decision.

**112.**  At said, hearing, MS. PAPPO falsely testified that the Plaintiff had taken medical leave and that she was unsure why. This was more than three (3) years after MS. PAPPO was first made aware of the Plaintiff's work injury and began denying her the medically necessary EWS she required to work. By the time MS. PAPPO testified to the WC Board, the Plaintiff had been seen by numerous medical professionals, MS. PAPPO was fully aware of the issue with the EWS, she

consistently refused to order the EWS, the Plaintiff was forced out of work as a result, lost her benefits, and was than persistently harassed by MS. PAPPO while at home trying to recuperate. Despite all of this, MS. PAPPO knowingly, falsely testified to the WC Board that she had no clue as to why the Plaintiff was out of work.  Defendant MMC was fully aware of MS. PAPPO'S false and fraudulent testimony, yet they did nothing to stop or correct it, and therefore are complicit in her behavior as is CORVEL CORPORATION and MS. LATOUR.

**113.**   Throughout this entire time, MS. PAPPO and MMC retaliated against the Plaintiff in numerous, unconscionable ways, not only because of her worker's compensation claim and need for medical accommodation, which MS. PAPPO expressed unjustified frustration with, but also because black dieticians at MMC (if they are granted employment at all), are less favorable to the Defendants than white ones.

**Defendants' Racial Animus**

**114.**   MS. PAPPO has made clear her disdain for black employees and the foregoing treatment of the Plaintiff was due to her race and skin color.  During the incident in December 2019, with Caitlin Cassidy who changed the patient's feeding tube without authorization from MS. PAPPO, MS. PAPPO first reprimanded and literally yelled at the Plaintiff for this mistake, and then took no action whatsoever against Ms. Cassidy, who actually committed the error. In fact, Ms. Cassidy approached the Plaintiff directly after this incident and stated "I heard that Miriam was yelling at you, why didn't she call me? **She knows that I am the one who changed the feeding because my notes are in the patient's chart.**"

**115.**   MS. PAPPO has a sordid habit of blaming the Plaintiff for the mistakes of her white colleagues, reprimanding her for said mistakes, and letting the white employees off the hook without so much as addressing the incident with them.

**116.** This type of overt racial bias and disparate treatment is also clearly evident in the hiring practices of MMC and MS. PAPPO, who have hired exactly one black dietician, Ms. Nicole Keen, in MS. PAPPO'S nearly twenty (20) years as the Clinical Director.

117. Another example of MMC and MS. PAPPO'S racial bias can be found in the DHR complaint submitted against Defendants MMC and MS. PAPPO by Ms. Claire Esson-Samuels on October 8, 2018, **NYSDHR case # 10199610.**

**118.** Claire Esson-Samuels is an African American female, who was employed by the Respondent Montefiore Medical Center beginning in March of 2007 and was transferred to the supervision of Defendant MIRIAM PAPPO, in October of 2018. Ms. Samuels experienced the same discrimination on the basis of race that Plaintiff alleges herein. Ms. Samuels' allegations against the Defendants MMC and MIRIAM PAPPO, in cohort with the instant matter, indicates a disturbing pattern of racial discrimination being allowed to perpetuate at Defendant Montefiore Medical Center, particularly under the supervision of Ms. Miriam Pappo. **(*See* Exhibit 2, NYSDHR case # 10199610).**

119. Ms. Samuels was placed on a probationary period with MMC after her transfer to MS. PAPPO'S department. During this time, Ms. Samuels asserted on the record that MS. PAPPO pressured, intimidated, and discriminated against her, failed to properly train her, and openly mocked and scolded her in front of other employees. This is the exact same treatment received by the Plaintiff at the hands of the Defendants.

120. In fact, according to Ms. Esson-Samuels, the harassment from MS. PAPPO was so pervasive and intense, that on October 27, 2018, Ms. Samuels fell ill at work, went to the emergency room, and was admitted to the hospital.  Unbelievably, MS. PAPPO went to the

hospital and began asking Ms. Samuels probing questions about her medical condition, eerily similar to what MS. PAPPO did to the Plaintiff in this matter.

121.  This apparent custom, and acceptable pattern and practice of MMC and MS. PAPPO, of having MS. PAPPO harass injured workers while demanding confidential medical information is morbid and unacceptable.

122.  Notably, in the two known instances where MS. PAPPO attempted to intimidate injured workers, both of the workers were black.

123.  On December 11, 2018, Ms. Pappo, Mr. Reda, and Union representatives all met regarding Ms. Samuels' complaint. Ms. Pappo was instructed to assign a new dietician to mentor Ms. Samuels and to ensure that Ms. Samuels completed some computer training. Ms. Pappo did neither of these things, and instead, the very next day Ms. Pappo began a set of multiple harassing phone calls and personal interruptions of Ms. Samuels work.

124.  Remarkably, on January 7, 2019, MS. PAPPO informed Ms. Samuels that she had failed her probation and terminated her employment. A white dietician was hired to replace Ms. Samuels. Prior to this experience with MS. PAPPO, Ms. Samuels had been a Registered Dietician at other Montefiore locations for nearly **twelve (12) years**, yet it took only three (3) months for MS. PAPPO to sabotage her career.

125.  MS. PAPPO also retaliated against the plaintiff by refusing to allow her to cover the rotations of her colleague, Stacy Carlson who during her time off and during the COVID pandemic. Prior to this incident, the Plaintiff routinely covered shifts for this colleague per MMC's own "Staff List".  Instead, MS. PAPPO offered these shifts to the other white dieticians, whom she favors over the plaintiff.

126. MS. PAPPO has been overheard by the Plaintiff, and another employee, Ms. Suzanne Murphy, disparaging communities which have a largely black demographic in favor of those with a largely white demographic, and she has purposely avoided forging relationships with the colleges in the area to avoid hiring dieticians of color, specifically Black dieticians due to the percentage of black students who attend these institutions.  Ms. Pappo specifically said that "the students from Lehman and City College are not bright… I get a better-quality student from NYU." Notably, the Plaintiff attended Lehman College.

127. Also notable, is that in her nearly twenty (20) years as Clinical Director, MS. PAPPO could not identify a single black student from NYU to hire, or to intern at MMC.  However, her predecessor, Ms. Debra Katz, had no such issues locating qualified black students from Lehman College, City College, or NYU.

128. Moreover, Plaintiff has been left out of research assignments, had duties and responsibilities removed from her without notice, berated and demeaned before her colleagues. Further, MS. BROWN was removed from her rotation, made to report to a subordinate employee without notice or explanation, and downright disrespected, disregarded, debased, and pitted against her co-workers.

129. All these actions and incidents created a climate in the Department of Clinical Nutrition that became the norm. It was not hidden from Plaintiff's co-workers as they would often comment on MS. PAPPO'S treatment of the Plaintiff.

130. The refusal to properly and timely provide Plaintiff with the prescribed and needed workstation, the manipulation of her Worker's Compensation matter by fraudulent means by MS. PAPPO and MS. LATOUR, the excessive scrutinization and micromanaging of her work, actions and whereabouts, the isolation from her co-workers, removal of duties and responsibilities, denial

of professional opportunities, coupled with the continuous denial of her rightfully earned benefits, is all a part of the ongoing discrimination which has created a very hostile work environment affecting both her physical and her mental and emotional states.

131.   Another example of the racial discrimination endured at the hands of MS. PAPPO in the Clinical Nutrition Department is that of Ms. Claire Esson-Samuels.

132.   The plaintiff was subjected to a hostile work environment, as was discriminated against, and retaliated against by collective Defendants because of her race and the color of her skin.

133. Defendants' actions caused Plaintiff to suffer loss of employment, loss of income, loss of employment benefits, and has suffered and continues to suffer permanent and serious physical injuries, severe pain and suffering, emotional and psychological distress, great expense, attorneys' fees, embarrassment, humiliation.

134. Defendants have demonstrated a pattern of racist, harassing, and discriminatory behavior directed at African American employees. What is worse, is that these behaviors, in both instances, have resulted in long-term medical issues for both Plaintiff and Ms. Samuels, the exact longitudinal effects of which cannot be known at this time.

### AS AND FOR THE FIRST CAUSE OF ACTION
### 42 U.S.C. § 1981-RACE AND COLOR DISCRIMINATION
### Disparate Treatment, Hostile Work Environment And Retaliation

135.   Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 134, as if fully incorporated herein.

136.   The above discriminatory pattern and practice based on race and color by the collective Defendants', violates 42 U.S.C. §1981.

137. As a direct and proximate result of said acts, Plaintiff has suffered and continues to physical injury, physical pain and suffering, emotional distress, humiliation, expense, embarrassment, damage to her character and reputation.

138. Plaintiff has been sorely mistreated and subjected to harassment, retaliation, and disparate treatment by Defendants MMC, PAPPO, CORVEL, and LATOUR, because of her race, color, and for opposing the discriminatory and retaliatory treatment she suffered.

139. Based on the foregoing, Plaintiff was treated differently than other similarly situated White dieticians at Defendant MMC, and this disparity was solely because of Plaintiff's race and color and fervent opposition to the discriminatory treatment in being denied rightful benefits because of her race and color by the Defendants.

140. The Collective Defendants discriminated against Plaintiff by denying Plaintiff her rightful employee benefits and her request for a reasonable accommodation, denying her proper training to sabotage her work, for isolating her from her colleagues, berating and yelling at her in front of the other staff members when no one else was treated as such, blaming Plaintiff for the mistakes of her White counterparts, removing job duties and responsibilities, preventing her from participating in research projects as her other colleagues, denying her the opportunity to be a Preceptor as the other White dieticians, generally supervising Plaintiff in a demeaning, different, and harsher manner than similarly situated white nurses, thereby subjecting Plaintiff to differential and discriminatory treatment.

141. All of these acts served to create a toxic and hostile work environment for MS. BROWN which became so pervasive that the other dieticians would comment about how Plaintiff was treated differently.

142. Defendant MMC knew or should have known about the disparate, discriminatory, and retaliatory treatment Plaintiff was made to endure at the hands of MS. PAPPO, its agents, employees, and assigns.

143. Defendants focused their actions on making the work environment hostile, toxic and non-welcoming to Plaintiff as a Black woman.  As such, Plaintiff was subjected to repeated acts of abuse that caused her extreme distress and physical harm in the workplace.

144. As a direct and proximate cause of said acts, Plaintiff suffered loss of employment, loss of employment benefits and loss of income, and continues to suffer physical pain, emotional and psychological distress, humiliation, embarrassment, permanent injury, and irreparable damage to her reputation.

145. Plaintiff has been subjected to a hostile work environment, abuse, mistreatment as detailed above, and has been treated differently than her similarly situated white counterparts because of her race and color.

146. As a result of Defendants' discriminatory and retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish, physical pain and suffering, and humiliation.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Against Defendant MMC)**
**Title VII of the Civil Rights Act of 1964.**
**42 U.S.C 2000(e) et seq.,**
**Racial Discrimination; Failure to Train; Hostile Work Environment; Disparate Treatment**

147.  Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 146, as if fully incorporated herein..

148. At all times relevant to the allegations herein, Plaintiff was experiencing continuous and pervasive discrimination based on her race and color through a series of related incidents, perpetrated by Ms. Pappo and allowed by Defendant MMC.

149. Plaintiff has been out on leave since August 20, 2020, and to date she has not received any workers' compensation benefits and has been without any monetary compensation and medical benefits due to Ms. Pappo's racial animus towards the plaintiff as supported by MMC. Thus, the violations of Plaintiff's rights are ongoing and continuing.

150. The discrimination complained of by Plaintiff is prohibited under Title VII of the Civil Rights Act of 1964 ("Title VII") and Article 15 § 296 of The New York State Executive Law. Both Title VII and §296 make it unlawful for an employer to subject an employee to unequal terms and conditions of employment based upon race and national origin.

151. Here, it is undisputed that Plaintiff is a Black woman of African descent and is a member of a statutory protected class. Furthermore, it is undisputed that Plaintiff is qualified for Respondent's position as a Registered Dietitian as she is duly licensed in the State of New York and has maintained her license pursuant to the requirements of NYSED Division of Licensing. Additionally, she has been employed with MMC for more than twenty (20) years.

152. The factual evidence will show the adverse employment actions by MMC, which are still ongoing, and continuous against the Plaintiff, and give rise to an inference of invidious racial discrimination, as illustrated herein.

153. The work environment of the Clinical Nutrition Department became so abusive that Plaintiff was made to endure and suffer physical injury due to the continuous disregard for her health and safety despite numerous prescriptions, calls, directives, and interventions to provide her the reasonable accommodation as prescribed by medical practitioners and requested by Plaintiff.

154.   The conditions of her work environment were altered to the point that she had to go on a work-related leave of absence due to the intentional exacerbation of her injuries while enduring the disparate treatment due to the fact that Ms. Pappa had a disdain for her because she is Black.

155.   This attitude became so pervasive that it was not hidden from the other practitioners who often made comments about Ms. Pappo's disparate and discriminatory treatment of the Plaintiff. The humiliation, and outward demonstration of disrespect and disdain shown toward plaintiff became such that the stress coupled with the actual physical injury created and worsened by the Defendants, severely interfered with Plaintiff's performance to the point where she has been on work-related leave of absence since August 20, 2020, and still being made to endure harassment and discriminatory treatment at the hands of MMC.

### AS AND FOR A THIRD CAUSE OF ACTION
### (Against Defendants MMC and CORVEL)
### Vicarious Liability

156.   Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 155, as if fully incorporated herein..

157.   "For an employer to be held liable for the conduct of its employees a plaintiff must demonstrate a basis for liability." *Little v. National Broadcasting Company, Inc.*, 210 F. Supp. 2d 330, 392 (S.D.N.Y. 2002).

158.   When the perpetrator is the Plaintiff's supervisor, there is a presumption that the employer is liable. *Id*. See Also *Fitzgerald v. Henderson,* 251 F.3d 345, 357(2d Cir. 2001).

159.   Here, at all times, the perpetrators of the illicit acts taken against the plaintiff were Ms. Pappo, who was the Clinical Director at MMC, and there is no doubt as to her supervisory capacity. The other was Ms. LaTour, who is a Claims Specialist at Corvel, whose supervisory capacity is

less known, but can be reasonably be inferred given her ability to manipulate documents and strongly influence the acceptance or denial of claims.

160.  Plaintiff asserts that both Ms. Pappas and Ms. LaTour were acting as supervisors, and accordingly, MMC and Corvel are liable for their conduct.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Against Defendants PAPPO and LATOUR)
### (Fraudulent Misrepresentation)

161.  Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 160, as if fully incorporated herein.

162.  Defendant PAPPO committed fraudulent misrepresentation by inserting herself as the contact person for the plaintiff's worker's compensation claim, fraudulently declaring herself as the point of contact, and submitting false documents stating that the Plaintiff's injuries were "non-work related."

163.  Defendant LaTour aided and abetted this scheme by falsifying the employer address on the WC claim, so that all of the Plaintiff's confidential medical information would be forwarded straight to Ms. Pappo.

164.  These defendants misrepresented to the WC Board and to HR the nature of the plaintiff's injury, Ms. Pappo's role in the matter, and forwarded the address for all of the plaintiff's medical records; with the clear intent to deceive both.

165.  As a result of these defendants' willful misrepresentations, the plaintiff was denied WC, lost her medical benefits, and lost her salary while on leave.

## <u>AS AND FOR A FIFTH CAUSE OF ACTION</u>
### (Against Defendants PAPPO and LATOUR)
#### <u>Abuse of Process</u>

166.  Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 165, as if fully incorporated herein.

167. An abuse of process claim requires proof of three elements: First, there must be regularly issued process, civil or criminal, compelling the performance or forbearance of some prescribed act. Next, the person activating the process must be moved by a purpose to do harm without that which has been traditionally described as economic or social excuse, or justification . . . Lastly, defendant must be seeking some collateral advantage or corresponding detriment to the plaintiff which is outside the legitimate ends of the process. *Merrill Lynch Futures, Inc. v. Miller*, 686 F. Supp. 1033 (S.D.N.Y. 1988).

168.  The Plaintiff's worker's compensation proceedings were a civil process which required action from both MS. PAPPO and MS. LATOUR.

169.  Both of these defendants abused the civil process by falsifying documents, lying to the WC Board, and deliberately mischaracterizing the plaintiff's leave of absence as "non-work related."

170.  These actions were specifically crafted to harm the plaintiff by denying her claim, having all of her confidential records sent to MS. PAPPO'S, losing her benefits, and losing her salary.

171.  None of these foregoing acts are authorized by the process. In fact, knowingly making a false statement to the WC Board is a **felony** pursuant to Section 114.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**(Against Defendants PAPPO and LATOUR)**
<u>**Civil Conspiracy**</u>

172.  Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 171, as if fully incorporated herein..

173.  To make out a *prima facie* case of civil conspiracy under New York law, the plaintiff must adequately plead the following four elements:

> "(1) the corrupt agreement between two or more persons, (2) an overt act, (3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting damage." *Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir. 1986). "Under New York law, a defendant may be held liable in tort for conspiracy to do an unlawful thing, or to do a lawful thing in an unlawful manner." *Arlinghaus v. Ritenour*, 622 F.2d 629, 639 (2d Cir. 1980).

174. The Plaintiff has shown herein that these defendants engaged in an agreement to have the plaintiff's WC claim denied, and they did so by falsifying documents, lying to the WC Board, and illicitly accessing the plaintiff's medical records. The resulting damage was the Plaintiffs loss of benefits and salary, not to mention the physical and emotional toll the actions of these defendants have imposed upon her.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**(Against Defendant MMC)**
<u>**Negligent Supervision**</u>

175.  Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 174, as if fully incorporated herein.

176. MS. PAPPO was allowed to remain in her very high position as Clinical Director despite multiple complaints of racial bias and harassment leveled against her beginning in at least 2018.

177.  A reasonable employer would have easily recognized MS. PAPPO'S propensity for the conduct alleged herein, and much of her illicit behavior was conducted at MMC and during work

hours; when it wasn't being done at a hospital bed to Ms. Samuels or through this Plaintiff's phone and email while she was at home trying to recover from her work-related injury.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Against Defendants PAPPO and LATOUR)
### Intentional Infliction of Emotional Distress

178. Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 177, as if fully incorporated herein.

179. To establish a *prima facie* case of intentional infliction of emotional distress under New York Law, a plaintiff must prove the following elements:

(1) extreme and outrageous conduct;
(2) intent to cause, or reckless disregard of a substantial probability of causing severe emotional distress;
(3) causal connection between the conduct and injury; and
(4) severe emotional distress.
*Turley v. ISG Lackawanna, Inc*., 803 F. Supp. 2d 217 (W.D.N.Y. 2011).

180. These defendants engaged in multiple acts of "extreme and outrageous conduct", namely, falsifying documents and lying to the WC Board, providing a false reason for the plaintiff's leave of absence, and redirecting the plaintiff's confidential medical paperwork to MS. PAPPO.

181. The above acts constitute multiple felonies, including providing a false statement to the WC Board, as well mail and wire fraud for using both of these avenues as part of their scheme to defraud the plaintiff using material misrepresentation.

182. These defendants intended to harm the Plaintiff as has been established herein, they acted do so, and they were successful.

183. Plaintiff has suffered severe emotional distress not only from the foregoing acts, but from the physical pain caused and exacerbated by the defendants' refusal to accommodate her medical needs.

## AS AND FOR A NINTH CAUSE OF ACTION
### (Against Defendants PAPPO and MMC)
### Negligent Infliction of Emotional Distress

184. Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 183, as if fully incorporated herein..

185.  To state a cause of action for negligent infliction of emotional distress, a plaintiff must allege the following elements:

> 1) that defendant was negligent in creating an unreasonable risk of bodily harm to the plaintiff;
> 2) that such conduct was a substantial factor in bringing about injuries to the plaintiffs; and
> 3) that the injuries are a consequence resulting from plaintiff's contemporaneous observation of serious physical injury or death inflicted by defendant's conduct on a member of plaintiff's immediate family in his or her presence.
> *Vieira v. Honeoye Central School District,* 756 F. Supp. 2d 302 (W.D.N.Y. 2010).

186. All these defendants had to do was follow the orders of multiple doctors and install the EWS for the Plaintiff. There is no innocent explanation for not doing so and not doing so created an unreasonable risk of harm.

187.  The injuries sustained by the Plaintiff are almost entirely due to this refusal to follow the orders of numerous specialists.

## AS AND FOR A TENTH CAUSE OF ACTION
### (Against All Defendants)
### Gross Negligence

188. Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 187, as if fully incorporated herein..

189.  Under New York law, "a plaintiff must establish three elements to prevail on a negligence claim: `(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and

(3) injury to the plaintiff as a result thereof.'" *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (quoting *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333, 441 N.Y.S.2d 644, 424 N.E.2d 531 (1981)).

190.  To prevail on a claim for gross negligence, plaintiff must establish each of the three previously described elements for negligence, *supra*, plus a fourth element, namely, that defendant's conduct "evinces a reckless disregard for the rights of others or `smacks' of intentional wrongdoing." *Id*.

191.  All defendants had a duty under HIPAA to keep the Plaintiff's medical records confidential. Defendant MMC has a duty under federal law not to discriminate on the basis of race or tolerate such, to provide a work environment free from hostility and racial animus and treat the plaintiff equally to her white counterparts.

192.  Defendants CORVEL INC. and MS. LATOUR violated HIPPA when they sent the Plaintiff's medical records to MS. PAPPO, instead of to the correct employer address, and when they falsified documents and lied to the WC Board.

193.  MMC and MS. PAPPO also violated HIPPA in the same manner, while also completely disregarding the plaintiff's rights under Title VII of the Civil Rights of 1964.

194.  The allegations contained herein show a reckless disregard on the part of all defendants for the rights of the plaintiff, and their actions speak directly to "intentional wrongdoing", specifically crafted to harm the plaintiff.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### (Against Defendant Corvel Inc.)
### Breach of the Covenant of Good Faith and Fair Dealing

195.  Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 194, as if fully incorporated herein.

196. Defendant CORVEL failed to act in good faith when they erroneously denied the plaintiff's worker's compensation claim.

197.  Despite the Plaintiff's full entitlement to worker's compensation benefits as part of her employment for her work-related injuries, Corvel denied said benefits in bad faith.

198.  CORVEL took actions such as manipulating the Plaintiff's records and sending her confidential medical information to MS. PAPPO, both in a blatant and malicious attempt to deny the Plaintiff's claim. None of these actions were taken in good faith and the Plaintiff has suffered tremendously as a result.

## AS AND FOR A TWELFTH CAUSE OF ACTION
### Against All Defendants
### Violation of New York State Human Rights Law

199.  Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 198, as if fully incorporated herein.

200.  Based upon the foregoing, the collective Defendants discriminated against Plaintiff based on her race and color when they treated her differently than her White counterparts in denying her rightful benefits and privileges pursuant to state law and terms of employment, and in wrongfully terminating her from her employment.

201. Defendants further retaliated against Plaintiff when she requested and persisted in requesting a reasonable accommodation in opposition to the discriminatory treatment of the Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff IVALEE BROWN demands judgment against the Defendants as follows:

a.    As and for All Counts in the sum in excess of Fifty- Million ($50,000,000.00) dollars;

b.    Attorney's fees and costs, pursuant to 42 U.S.C. §1988 and 42 U.S.C. §2000e-5(k);

c.    A declaratory judgment stating that Defendants willfully violated Plaintiff's rights secured by federal and state laws as alleged herein;

d.    Injunctive relief: an injunction requiring Defendants to correct all present and past violations of federal and state law as alleged herein; to allow the PLAINTIFF to continue in the position from which Defendants' illegally terminated her; to enjoin the Defendants from continuing to act in violation of federal and state law as alleged herein; and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal and state laws; and

e.    An Order granting punitive and compensatory damages and such other legal and equitable relief as the court deems just and proper.

### A JURY TRIAL IS HEREBY DEMANDED

Dated: Mount Vernon, New York
August 24, 2023

Respectfully submitted,

THE LAW OFFICES OF
TRICIA S. LINDSAY

By:   *Tricia Lindsay*
       TRICIA S. LINDSAY
       Attorneys for Plaintiff
       531 E. Lincoln Ave., Ste. 5B
       Mount Vernon, New York 10552
       (914) 668-4908; (347) 386-4604
       Tricialindsaylaw@gmail.com
       Attorney@tricialindsaylaw.com